IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs September 3, 2025

## IN RE LAY'LA R.

**Appeal from the Juvenile Court for Decatur County**
**No. 23-70     Paul Allen England, Judge**

_____

### No. W2025-00272-COA-R3-PT

_____

In this termination of parental rights case, Appellant/Father appeals only the trial court's denial of his motion for continuance. We conclude that the trial court did not abuse its discretion in denying the continuance. Although Father does not appeal the termination of his parental rights, we are required to review that decision. The trial court terminated Father's parental rights on the grounds of: (1) abandonment by an incarcerated parent by failure to visit, failure to support, and wanton disregard; (2) substantial noncompliance with the permanency plans; and (3) failure to manifest an ability and willingness to assume custody of the child. The trial court also found that termination of Appellant's parental rights was in the child's best interest. Discerning no error, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court**
**Affirmed and Remanded**

KENNY ARMSTRONG, J., delivered the opinion of the court, in which ANDY D. BENNETT and KRISTI M. DAVIS, JJ., joined.

Samuel W. Hinson, Lexington, Tennessee, for the appellant, Michael S.[1]

Jonathan Skrmetti, Attorney General and Reporter, and Clifton Wade Barnett, Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

### OPINION

### I. Background

_____

[1] In cases involving minor children, it is the policy of this Court to redact the parties' names to protect their identities.

In August 2023, Lay'la R. (the "Child") was born to Sayuri R. ("Mother") and Appellant Michael S. ("Father"). Although Mother's parental rights were also terminated, she did not appeal, and this appeal concerns only Father. When the Child was born, she was immediately transferred to the Vanderbilt Neonatal ICU due to gastroschisis, a condition where the bowel develops outside of the body. The Child was born drug exposed as Mother tested positive for oxycodone, THC, and methamphetamine on admission for the Child's birth. As discussed further, *infra*, the Child suffers from multiple issues. She has undergone surgery, and various therapies to treat her developmental and physical issues. Based on the Child's exposure to drugs, Appellee, Tennessee Department of Children's Services ("DCS"), was contacted shortly after the Child was born. DCS made multiple attempts to contact Father, which were unsuccessful. On September 8, 2023, the Child was placed in DCS custody. At that time, a hair follicle test showed that the Child was positive for methamphetamine, oxycodone, and methadone. On September 10, 2023, the Child was placed in a foster home, where she has remained. On December 8, 2023, DNA testing confirmed that Father is the Child's biological father. Thereafter, Father informed DCS that he desired to work towards reunification.

On January 5, 2024, DCS created the first permanency plan (the "First Plan") for Mother, Father, and the Child. The First Plan required Father to: (1) develop a visitation plan with DCS, including a minimum of two visits per month; (2) comply with the visitation plan and notify DCS in a timely manner if he was unable to attend; (3) interact with the Child in appropriate activities and promote a positive environment during each visit; (4) provide items during visitation such as food, snacks, and clean clothing; (5) sign releases of information, cooperate with DCS and all service providers, attend parenting classes, and comply with all court orders; (6) maintain contact with the DCS case manager at least twice per month and notify DCS of any changes in address, telephone number, employment, or household circumstances; (7) assist DCS in identifying relative and/or kinship placement options; (8) comply with probation requirements; (9) settle all pending and current criminal charges, and not incur additional criminal charges; (10) submit to and pass random drug screens; (11) abstain from alcohol abuse and the use of illicit and/or non-prescribed drugs; (12) abstain from associating with others who are actively under the influence or selling drugs; (13) complete an alcohol and drug assessment and a mental health intake and be open and honest with the assessor; (14) follow all substance abuse and mental health treatment recommendations; (15) provide DCS with verification of proof of income and housing; and (16) provide minimal housekeeping standards and ensure that anyone living in the household can pass a background check. On January 22, 2024, the Juvenile Court of Decatur County, Tennessee (the "trial court") ratified the First Plan.

On February 5, 2024, the trial court entered an order adjudicating the Child dependent and neglected.

On April 5, 2024, DCS created a second permanency plan (the "Second Plan"), which included the same responsibilities for Father as outlined above in the First Plan.

However, the Second Plan noted that, despite being aware of his paternity of the Child since January 2024, Father had not yet met her. Furthermore, Father had failed to satisfy even one of the requirements that would lead to reunification with his daughter, *i.e.*, (1) a drug screen; (2) a mental health assessment; and (3) a drug and alcohol intake assessment. Father also failed to enroll in parenting classes. The Second Plan stated that Father had not settled any of his pending criminal charges and had incurred new criminal charges. Although Father informed DCS that he had housing, Father did not respond to DCS' requests to visit. Furthermore, when DCS attempted to visit the address Father provided, he was not there. Similarly, although Father represented that he was employed, he failed to provide evidence of same. On May 20, 2024, the trial court ratified the Second Plan.

On April 11, 2024, DCS presented Father with a copy of the Criteria & Procedures for Termination of Parental Rights (the "Criteria and Procedures document"). This document explained that the Child was placed in foster care, that DCS had an obligation to assist Father in reunification, but that his parental rights could be terminated if, *inter alia*, he failed to: (1) pay child support; (2) attend regular visits with the Child; (3) complete the tasks outlined in the permanency plans; and (4) make changes to his living situation so the Child could be placed in his care. Although Father refused to sign the Criteria and Procedures document, the contents were explained to him by DCS.

On June 28, 2024, DCS filed a petition to terminate Father's parental rights. The petition alleged the following grounds for termination: (1) abandonment by an incarcerated parent by failure to visit, failure to support, and wanton disregard; (2) substantial noncompliance with the permanency plans; and (3) failure to manifest an ability and willingness to assume custody of the Child. The petition also alleged that termination of Father's parental rights was in the Child's best interest. On July 29, 2024, Father was served with the petition while incarcerated at the Decatur County Jail. On August 20, 2024, the trial court entered an order appointing a guardian ad litem for the Child.[2]

On September 9, 2024, the trial court held a status hearing. Although Father was incarcerated, he was transported to the hearing. During the hearing, the trial court appointed counsel for Father. The trial court also addressed Father's child support obligation. By order of September 23, 2024, the trial court: (1) appointed counsel to represent Father in the termination proceedings; (2) ordered Father to pay $100.00 per month in child support; and (3) determined that Father owed $1,200.00 in child-support arrears. This order also set the hearing on the termination petition for October 28, 2024. On October 28, 2024, the trial court convened, with Father's attorney present on his behalf. At that time, it was determined that DCS had not secured a court reporter for the hearing on the termination petition. Accordingly, the trial court continued the case to January 27, 2025.

---

[2] Although the guardian ad litem participated in the trial court proceedings, he did not file an appellate brief.

On January 27, 2025, the trial court heard the petition to terminate Father's parental rights. Although Father's attorney was present, Father was not. Father's attorney orally moved for a continuance due to Father's absence. The trial court denied the motion and proceeded to hear evidence from the following witnesses: (1) Crystal Jones, the DCS case manager; (2) Kelly B., the Child's foster mother ("Foster Mother"); and Mother. The trial court entered twenty-six exhibits into evidence.

By order entered February 24, 2025, the trial court terminated Father's parental rights. The trial court found that DCS proved the following grounds for termination by clear and convincing evidence: (1) abandonment by failure to visit; (2) abandonment by failure to support; (3) abandonment by wanton disregard; (4) substantial noncompliance with the permanency plans; and (5) failure to manifest an ability and willingness to assume custody of the Child. The trial court also considered the applicable best interest factors and determined that there was clear and convincing evidence that termination of Father's parental rights was in the Child's best interest. Father filed a timely notice of appeal.

## II. Issues

As stated in his appellate brief, Father's sole issue on appeal is: "Whether the Juvenile Court of Decatur County, Tennessee erred when it declined to continue [Father's] Termination of Parental Rights trial when [Father] was not present for said trial?"

Although Father does not challenge the trial court's finding that grounds existed to terminate his parental rights and that termination of his parental rights was in the Child's best interest, we are required to review those decisions. *See **In re Carrington H.***, 483 S.W.3d 507, 511, 535 (Tenn. 2016); *see also **In re Allison S.***, No. E2023-01072-COA-R3-PT, 2024 WL 2050502, at *9 (Tenn. Ct. App. May 8, 2024). Accordingly, in addition to Father's argument concerning the continuance, we will also review the trial court's findings and conclusions concerning the grounds for termination of Father's parental rights and its conclusion that termination of his rights was in the Child's best interest.

## III. Standard of Review

The Tennessee Supreme Court has explained that:

A parent's right to the care and custody of her child is among the oldest of the judicially recognized fundamental liberty interests protected by the Due Process Clauses of the federal and state constitutions. ***Troxel v. Granville***, 530 U.S. 57, 65, 120 S. Ct. 2054, 147 L.Ed.2d 49 (2000); ***Stanley v. Illinois***, 405 U.S. 645, 651, 92 S. Ct. 1208, 31 L.Ed.2d 551 (1972); ***In re Angela E.***, 303 S.W.3d 240, 250 (Tenn. 2010); ***In re Adoption of Female Child***, 896 S.W.2d 546, 547-48 (Tenn. 1995); ***Hawk v. Hawk***, 855 S.W.2d 573, 578-79 (Tenn. 1993). But parental rights, although fundamental and constitutionally

protected, are not absolute. *In re Angela E.*, 303 S.W.3d at 250. "'[T]he [S]tate as parens patriae has a special duty to protect minors . . . .' Tennessee law, thus, upholds the [S]tate's authority as parens patriae when interference with parenting is necessary to prevent serious harm to a child." *Hawk*, 855 S.W.2d at 580 (quoting *In re Hamilton*, 657 S.W.2d 425, 429 (Tenn. Ct. App. 1983)); *see also* *Santosky v. Kramer*, 455 U.S. 745, 747, 102 S.Ct. 1388, 71 L. Ed.2d 599 (1982); *In re Angela E.*, 303 S.W.3d at 250.

*In re Carrington H.*, 483 S.W.3d at 522-23 (footnote omitted). In Tennessee, termination of parental rights is governed by statute, which identifies "'situations in which the state's interest in the welfare of a child justifies interference with a parent's constitutional rights by setting forth grounds on which termination proceedings can be brought.'" *In re Jacobe M.J.*, 434 S.W.3d 565, 568 (Tenn. Ct. App. 2013) (quoting *In re W.B.*, Nos. M2004-00999-COA-R3-PT, M2004-01572-COA-R3-PT, 2005 WL 1021618, at *7 (Tenn. Ct. App. Apr. 29, 2005) (citing Tenn. Code Ann. § 36-1-113(g))). Thus, a party seeking to terminate a parent's rights must prove: (1) the existence of one of the statutory grounds; and (2) that termination is in the child's best interest. Tenn. Code Ann. § 36-1-113(c); *In re D.L.B.*, 118 S.W.3d 360, 367 (Tenn. 2003); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002).

Considering the fundamental nature of a parent's rights and the serious consequences that stem from termination of those rights, a higher standard of proof is required in determining termination cases. *Santosky*, 455 U.S. at 769. As such, a party must prove statutory grounds and the child's best interest by clear and convincing evidence. Tenn. Code Ann. § 36-1-113(c); *In re Valentine*, 79 S.W. 3d at 546. Clear and convincing evidence "establishes that the truth of the facts asserted is highly probable . . . and eliminates any serious or substantial doubt about the correctness of the conclusions drawn from evidence[,]" and "produces in a fact-finder's mind a firm belief or conviction regarding the truth of the facts sought to be established." *In re M.J.B.*, 140 S.W.3d 643, 653 (Tenn. Ct. App. 2004).

In termination of parental rights cases, appellate courts review a trial court's factual findings *de novo* and accord these findings a presumption of correctness unless the evidence preponderates otherwise. Tenn. R. App. P. 13(d); *In re Carrington H.*, 483 S.W.3d at 523-24 (citing *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010); *In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009); *In re A.M.H.*, 215 S.W.3d 793, 809 (Tenn. 2007)). The Tennessee Supreme Court has explained that:

> The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review *de novo* with no presumption of correctness. *In re M.L.P.*, 281 S.W.3d at 393 (quoting *In re [A.M.H.]*, 215 S.W.3d at 810). Additionally, all other questions of law in parental termination appeals, as in other appeals, are

- 5 -

reviewed *de novo* with no presumption of correctness. ***In re Angela E.***, 303 S.W.3d at 246.

***In re Carrington H.***, 483 S.W.3d at 524.

## IV. Analysis

## A. Motion for Continuance

This Court has discussed continuances in the context of termination proceedings:

"The granting or denial of a motion for a continuance lies in the sound discretion of the court. The ruling on the motion will not be disturbed unless the record clearly shows abuse of discretion and prejudice to the party seeking a continuance." ***State Dep't of Child.'s Servs. v. V.N.***, 279 S.W.3d 306, 317 (Tenn. Ct. App. 2008) (quoting ***Blake v. Plus Mark Inc.***, 952 S.W.2d 413, 415 (Tenn. 1997)). In requesting a continuance, [the parent] bears the burden to "establish[ ] the circumstances that justif[ied] the continuance." ***In re Paetyn M.***, No. W2017-02444-COA-R3-PT, 2019 WL 630124, at *5 (Tenn. Ct. App. Feb. 14, 2019) (citing ***Osagie v. Peakload Temp. Servs.***, 91 S.W.3d 326, 329 (Tenn. Ct. App. 2002)). "Decisions regarding the grant or denial of a continuance are fact-specific and 'should be viewed in the context of all the circumstances existing' at the time of the request." *Id.* (quoting ***Nagarajan v. Terry***, 151 S.W.3d 166, 172 (Tenn. Ct. App. 2003)). These circumstances include: "(1) the length of time the proceeding has been pending, (2) the reason for the continuance, (3) the diligence of the party seeking the continuance, and (4) the prejudice to the requesting party if the continuance is not granted." *Id.* (quoting ***Nagarajan***, 151 S.W.3d at 172).

***In re Chayson D.***, No. E2022-00718-COA-R3-PT, 2023 WL 3451538, at *5 (Tenn. Ct. App. May 15, 2023) (quoting ***In re Azhianne G.***, No. E2022-00223-COA-R3-PT, 2023 WL 2487390, at *2 (Tenn. Ct. App. Mar. 14, 2023)); *see also* ***In re Ashanti P.***, No. M2021-00039-COA-R3-PT, 2021 WL 5549590, at *7 (Tenn. Ct. App. Nov. 29, 2021) (noting that the trial court retains its discretion regarding continuances, "even when the question before it is one of termination of parental rights" (quoting ***State, Dep't of Child.'s Servs. v. Fineout***, No. 01A01-9710-JV-00582, 1998 WL 792052, at *2 (Tenn. Ct. App. Nov. 16, 1998))).

Although the record contains a transcript of the hearing, Father's attorney's oral motion for continuance is not recorded there, and there is no written motion in the record. However, at the conclusion of the hearing, the trial court stated:

> I want to make sure we've got it on the record that before we started this hearing, Mr. Hinson, on behalf of [Father], asked for a continuance based on [Father] not being present. Obviously I denied that motion. [Father] has only been present on times, I believe, when he's been transported from the jail. I don't think I've seen him any other time. I wanted to make sure that was on the record.

In its order terminating Father's parental rights, the trial court explained:

> The attorney for the [F]ather . . . made an oral motion to continue as his client, [Father] was not present. The [c]ourt finds that [F]ather had previously appeared and was aware of the [c]ourt date and denies the motion to continue.
>
> ***
>
> The [c]ourt finds that [F]ather . . . failed to appear to participate in these proceedings. The State moved to proceed in [F]ather's absence, in that [F]ather was properly before the [c]ourt. The [c]ourt finds that [F]ather was personally served on July 29, 2024, with a copy of the Petition to Terminate Parental Rights and a summons which informed [F]ather of the date, time and location of these proceedings. Thereafter, [F]ather appeared and requested appointment of counsel, and an attorney was appointed to represent him. The attorney for [F]ather . . . made an oral motion to continue as his client. . . was not present. The [c]ourt finds that [F]ather had previously appeared and was aware of the court date and denies the motion to continue. As such, the [c]ourt granted the State's motion to proceed in this cause and in [F]ather's absence.

In his brief, Father states that he

> was incarcerated for most of the proceedings in Juvenile Court but was released shortly before the hearing date on January 27, 2025. Counsel for [Father] objected at the termination hearing and requested a continuance because [Father] was not present, likely because he had just been released from jail and was not aware.

The trial court's findings, *supra*, are supported by the record and belie Father's contention that he "was not aware" of the hearing on the petition to terminate his parental rights. As noted by the trial court, Father was aware of these proceedings, and his attorney was present when the trial court continued the hearing from October 28, 2024, to January 27, 2025. As noted above, "[i]n requesting a continuance, [the parent] bears the burden to 'establish[] the circumstances that justif[ied] the continuance.'" **In re Paetyn M.**, 2019 WL 630124, at *5 (citation omitted). From the trial court's comment that "[Father's attorney] asked for

a continuance based on [Father] not being present," we glean that the primary (and perhaps only) reason given for the continuance was the fact that Father was absent despite evidence showing that he was notified of the hearing. Father fails to offer any evidence concerning the reasons for his absence from the scheduled hearing. Father was not incarcerated at the time of the hearing, and the record is devoid of any reason for Father's absence from the final trial. For these reasons, we conclude that the trial court did not abuse its discretion in denying Father's motion for a continuance.

## B. Grounds for Termination

While only one ground must be proven by clear and convincing evidence, the Tennessee Supreme Court has held that "appellate courts must review a trial court's findings regarding all grounds for termination and whether termination is in a child's best interest, even if a parent fails to challenge these findings on appeal." *In re Carrington H.*, 483 S.W.3d at 511. Accordingly, we will address each of the grounds found by the trial court.

### 1. Abandonment by an Incarcerated Parent

We begin with the trial court's conclusion that Father abandoned the Child. Under Tennessee Code Annotated section 36-1-113(g)(1), a parent's parental rights may be terminated when the parent abandons the child as defined in Tennessee Code Annotated section 36-1-102. Relevant here, section 36-1-102(1)(A) provides:

> For purposes of terminating the parental . . . rights of a parent . . . to that child . . . "abandonment" means that:
>
> > (iv) A parent . . . is incarcerated at the time of the filing of a . . . . petition . . . to terminate the parental rights of the parent . . . of the child who is the subject of the petition for termination of parental rights . . . and has:
> >
> > > (*b*)(*2*) Failed to visit, has failed to support, or has failed to make reasonable payments toward the support of the child during an aggregation of the first ninety (90) days of nonincarceration immediately preceding the filing of the action if the child is less than four (4) years of age; or
> > >
> > > ***
> > >
> > > (*c*) With knowledge of the existence of the born . . . child, engaged in conduct prior to, during, or

- 8 -

after incarceration that exhibits a wanton
disregard for the welfare of the child[.]

Tenn. Code Ann. § 36-1-102(1)(A)(iv)(b)(2), (c). When DCS filed the petition to terminate Father's parental rights on June 28, 2024, the Child was younger than four, and Father was incarcerated. As the trial court found, and the record supports, Father was incarcerated from April 1, 2024, through April 8, 2024, and again from May 2, 2024, through November 14, 2024. Accordingly, the relevant 90-day statutory time-period was from January 23, 2024, through March 31, 2024 (68 days) and April 9, 2024, through May 1, 2024 (22 days). Thus, as to the first two abandonment grounds, it was DCS' burden to prove that Father failed to visit and/or failed to support the Child during the foregoing 90 days. Concerning the ground of abandonment by wanton disregard, *see* Tenn. Code Ann. § 36-1-102(1)(A)(iv)(c), it does not require that the conduct at issue occur within the relevant period prior to incarceration, *i.e.,* the 90-day time-period discussed above. *In re Audrey S.*, 182 S.W.3d 838, 865 (Tenn. Ct. App. 2005). As discussed further, *infra*, for abandonment by wanton disregard, Tennessee courts may consider the parent's behavior throughout the child's life, even when the child is in utero. *See In re A.B.*, No. E2016-00504-COA-R3-PT, 2017 WL 111291, at *10 (Tenn. Ct. App. Jan. 11, 2017) ("For a child in utero, we primarily have found wanton disregard where a parent, after learning of the pregnancy, commits the crime for which he or she is subsequently incarcerated."); *but see In re Anthony R.*, No. M2014-01753-COA-R3-PT, 2015 WL 3611244, at *3 (Tenn. Ct. App. June 9, 2015) (concluding that father's actions that led to his incarceration did not constitute wanton disregard for the child's welfare because father did not know that mother was pregnant with his child). We now turn to these three abandonment grounds.

### a.  Abandonment by Failure to Visit

Tennessee Code Annotated section 36-1-102(1)(E) provides that "failed to visit" consists of "the failure, for [the aggregation of the first 90 days of nonincarceration immediately preceding the termination petition], to visit or engage in more than token visitation." Tenn. Code Ann. § 36-1-102(1)(E). The statute defines "token visitation" as "visitation, under the circumstances . . . [that] constitutes nothing more than perfunctory visitation or visitation of such infrequent nature or of such short duration as to merely establish minimal or insubstantial contact with the child." Tenn. Code Ann. § 36-1-102(1)(C). "That the parent had only the means or ability to make very occasional visits is not a defense to failure to visit if no visits were made during the relevant time period[.]" Tenn. Code Ann. § 36-1-102(1)(E).

In the final order, the trial court found that "Father was not incapacitated in any way or prohibited by court order from visiting" during the relevant 90-day period. Furthermore, the trial court found that Father knew the Child was in DCS custody. The trial court also found that DCS tried to contact Father to schedule visitation, and that "Father could have regularly visited with the [C]hild if he had a negative hair follicle drug screen." However,

the trial court found that "Father visited with [her] zero times." The record supports these findings. Specifically, Ms. Jones, the DCS case manager, testified that Father knew the Child was in DCS custody and that he was able to visit her if he provided a negative drug screen. She further testified that, despite DCS' attempts, Father refused to submit to a drug screen. Ms. Jones testified that Father never visited the Child in the hospital after her birth, and he never visited her while she was in DCS custody. There is no evidence to dispute Ms. Jones' testimony. Accordingly, the record shows that Father failed to visit the Child during the relevant 90-day period discussed above. As such, we affirm the trial court's conclusion that Father abandoned the Child by failing to visit her.

### b. Abandonment by Failure to Support

Tennessee Code Annotated section 36-1-102(1)(D) provides that "failed to support" or "failed to make reasonable payments toward [a] child's support" consists of "the failure, for [the aggregation of the first 90 days of nonincarceration immediately preceding the termination petition], to provide monetary support or the failure to provide more than token payments toward the support of the child." Tenn. Code Ann. § 36-1-102(1)(D). The statute defines "token support" as "support [that], under the circumstances . . . , is insignificant given the parent's means." Tenn. Code Ann. § 36-1-102(1)(B). "That the parent had only the means or ability to make small payments is not a defense to failure to support if no payments were made during the relevant time period[.]" Tenn. Code Ann. § 36-1-102(1)(D). In the final order, the trial court found that Father knew or should have known of his support obligation because DCS reviewed the Criteria and Procedures document with him, which discussed that his parental rights could be terminated if he failed to provide financial support for the Child. We also recall that Father was present for the hearing where the trial court established his monthly child support obligation of $100.00. As such, Father was undoubtedly aware that he was required to support the Child financially. Assuming, *arguendo*, that Father was unaware of the child support order, "[p]arents are presumed to know they have a legal obligation to support their children." *In re Sydney B.*, 537 S.W.3d 452, 458 (Tenn. Ct. App. 2017) (citing Tenn. Code Ann. § 36-1-102(1)(H)). In the final order, the trial court found that "Father failed to make reasonable payments toward[s] the [C]hild's support." The trial court also found that "Father is able-bodied and capable of working and earning enough to support himself as well as paying child support. He does not have a disability that stops him from working and he has worked in the past." Turning to the record, Ms. Jones testified that Father never made any payments towards child support. There is no evidence to dispute this testimony and the trial court's above findings. Accordingly, we affirm the trial court's conclusion that Father abandoned the Child by failing to support her.

### c. Abandonment by Wanton Disregard

Concerning what constitutes wanton disregard, this Court has explained that:

> Incarceration alone is not conclusive evidence of wanton conduct prior to incarceration. ***In re Audrey S.***, 182 S.W.3d [at 866]. Rather, "incarceration serves only as a triggering mechanism that allows the court to take a closer look at the child's situation to determine whether the parental behavior that resulted in incarceration is part of a broader pattern of conduct that renders the parent unfit or poses a risk of substantial harm to the welfare of the child." ***Id.*** The statutory language governing abandonment due to a parent's wanton disregard for the welfare of a child "reflects the commonsense notion that parental incarceration is a strong indicator that there may be problems in the home that threaten the welfare of the child" and recognizes that a "parent's decision to engage in conduct that carries with it the risk of incarceration is itself indicative that the parent may not be fit to care for the child." ***Id.***

***In re C.A.H.***, No. M2009-00769-COA-R3-PT, 2009 WL 5064953, at *5 (Tenn. Ct. App. Dec. 22, 2009).

In its order terminating Father's parental rights, the trial court found that Father "has regularly engaged in criminal conduct that results in jail time," and that he exhibited a "wanton disregard for the [C]hild's welfare by continuing to engage in conduct that results in" Father being jailed. As stated above, incarceration alone is not conclusive of wanton conduct. This Court has "repeatedly held that probation violations, repeated incarceration, criminal behavior, substance abuse, and the failure to provide adequate support or supervision for a child can, alone or in combination, constitute conduct that exhibits a wanton disregard for the welfare of a child." ***In re Audrey S.***, 182 S.W.3d at 867-68 (internal citations omitted). Indeed, "[t]he actions that our courts have commonly found to constitute wanton disregard reflect a 'me first' attitude involving the intentional performance of illegal or unreasonable acts and indifference to the consequences of the actions for the child." ***In re Anthony R.***, 2015 WL 3611244, at *3. In addition to Father's multiple incarcerations, as discussed above, he refused to submit to a drug screen so that he could exercise visitation with the Child. Furthermore, Father has provided no financial support for the Child, although he was specifically ordered to do so. Moreover, as discussed *infra*, the record shows that Father has taken no interest in the Child's medical needs; as such, he is lacking the information necessary to provide the Child with adequate care. Indeed, Father has refused to take any of the necessary steps that would allow the Child to be placed safely in his care. The foregoing clearly demonstrates Father's "me first" attitude and that he is unfit to parent the Child. As such, the record supports the trial court's conclusion that Father abandoned the Child by wanton disregard.

### 2. Substantial Noncompliance with the Permanency Plans

The trial court found that Father's parental rights should be terminated on the ground of substantial noncompliance with the requirements of the permanency plans. Tennessee Code Annotated Section 36-1-113(g)(2) provides that a parent's rights may be terminated

- 11 -

when "[t]here has been substantial noncompliance by the parent . . . with the statement of responsibilities in a permanency plan[.]"

"[T]he permanency plans are not simply a series of hoops for the biological parent to jump through in order to have custody of the children returned." *In re C.S., Jr., et al.*, No. M2005-02499-COA-R3-PT, 2006 WL 2644371, at *10 (Tenn. Ct. App. Sept. 14, 2006). Rather,

> the requirements of the permanency plan are intended to address the problems that led to removal; they are meant to place the parent in a position to provide the children with a safe, stable home and consistent appropriate care. This requires the parent to put in real effort to complete the requirements of the plan in a meaningful way in order to place [himself or] herself in a position to take responsibility for the children.

*Id.* As this Court discussed in *In re A.J.R.*, No. E2006-01140-COA-R3-PT, 2006 WL 3421284, at *4 (Tenn. Ct. App. Nov. 28, 2006):

> To prevail in a termination case on a claim of substantial noncompliance with a permanency plan, DCS must prove: (1) the terms of the plan, *Dep't of Children's Services v. D.W.J.*, No. E2004-02586-COA-R3-PT, 2005 WL 1528367 (Tenn. Ct. App. E.S., June 29, 2005); (2) that the plan requirements were reasonable and related to remedying the conditions that caused the child to be removed from the parent's custody in the first place, *In re Valentine*, 79 S.W.3d at 547; *In re L.J.C.*, 124 S.W.3d 609, 621 (Tenn. Ct. App. 2003); and (3) that the parent's noncompliance was substantial in light of the degree of noncompliance and the importance of the particular requirement that has not been met. [*In re*] *Valentine*, 79 S.W.3d at 548-49; *In re Z.J.S.*, No. M2002-02235-COA-R3-JV, 2003 WL 21266854, at *12 (Tenn. Ct. App. M.S., June 3, 2003); *Dep't of Children's Services v. T.M.B.K.*, 197 S.W.3d 282, 293 (Tenn. Ct. App. 2006).

*In re A.J.R.*, 2006 WL 3421284, at *4. The Tennessee Supreme Court has explained that

> [s]ubstantial noncompliance is not defined in the termination statute. The statute is clear, however, that noncompliance is not enough to justify termination of parental rights; the noncompliance must be substantial. Black's Law Dictionary defines "substantial" as "[o]f real worth and importance." Black's Law Dictionary 1428 (6th ed. 1990). In the context of the requirements of a permanency plan, the real worth and importance of noncompliance should be measured by both the degree of noncompliance and the weight assigned to that requirement.

*In re Valentine*, 79 S.W.3d at 548.

As discussed above, under the permanency plans Father was required to: (1) visit with the Child; (2) participate in random drug screens; (3) complete an alcohol and drug assessment and follow treatment recommendations; (4) complete a mental health assessment and follow treatment recommendations; (5) follow all court orders and refrain from engaging in additional criminal activities; and (6) provide DCS with proof of income and stable housing. In the final order, the trial court found that these requirements were "reasonable and related to remedying the reasons for which the [C]hild[] [was] placed into and/or remain[ed] in foster care." We agree. The foregoing responsibilities were requirements to ensure that the Child would be placed in a drug-free, stable home, with a parent who could care for and support her and with whom she was bonded. The trial court found that, despite DCS' reasonable efforts, Father failed to comply with any of the permanency plan requirements. Specifically, the trial court found that Father: (1) failed to ever visit the Child; (2) continued to engage in criminal activity; and (3) failed to submit to drug screens. The record supports that Father failed to comply with these requirements. The record also shows that Father failed to comply with the remaining requirements. As Ms. Jones testified, Father failed to complete *any* of the responsibilities outlined in the plans. There is no evidence to contradict this testimony. In **State Department of Children's Services v. G.C.**, this Court addressed a similar situation where a mother failed to complete any of the eleven responsibilities outlined in her permanency plan. No. E2003-01532-COA-R3-CV, 2004 WL 178393, at *3 (Tenn. Ct. App. Jan. 29, 2004). In that case, we opined, "If ever there has been a clear case of substantial noncompliance with the plan, this is it." *Id.* The same is true here. Accordingly, we affirm the trial court's conclusion as to this ground.

### 3. Failure to Manifest an Ability and Willingness to Care for the Child

The final ground relied on to terminate Father's parental rights falls under Tennessee Code Annotated section 36-1-113(g)(14), which provides for termination when

> [a] parent . . . has failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the child, and placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child[.]

Tenn. Code Ann. § 36-1-113(g)(14). This ground required DCS to establish two separate elements by clear and convincing evidence. *In re Maya R.*, No. E2017-01634-COA-R3-PT, 2018 WL 1629930, at *7 (Tenn. Ct. App. Apr. 4, 2018) (citation omitted). First, that Father "failed to manifest 'an ability and willingness to personally assume legal and physical custody or financial responsibility of the [C]hild.'" *Id.* (quoting Tenn. Code Ann. § 36-1-113(g)(14)). Second, that placing the Child in Father's legal and physical custody

- 13 -

would "pose a risk of substantial harm to the physical or psychological welfare of the [C]hild." *Id.* The trial court found that DCS met its burden to prove both elements by clear and convincing evidence. We examine each element below.

Concerning the first prong of this ground, the Tennessee Supreme Court has concluded that "the expressed legislative intent for section 36-1-113(g)(14) is to require clear and convincing proof that a parent or legal guardian was either unable or unwilling to personally assume legal and physical custody or financial responsibility of a child." *In re Neveah M.*, No. M2019-00313-SC-R11-PT, 2020 WL 7258044, at *14 (Tenn. Dec. 10, 2020) (emphasis in original). Accordingly, "[i]f a person seeking to terminate parental rights proves by clear and convincing proof that a parent or guardian has failed to manifest either ability or willingness, then the first prong of the statute is satisfied." *Id.* (citing *In re Amynn K.*, No. E2017-01866-COA-R3-PT, 2018 WL 3058280, at *13 (Tenn. Ct. App. June 20, 2018)) (emphasis in original). When determining whether a parent has demonstrated an ability to assume custody, courts focus on a parent's lifestyle and circumstances. *In re Jonathan M.*, No. E2018-00484-COA-R3-PT, 2018 WL 5310750, at *5 (Tenn. Ct. App. Oct. 26, 2018) (citing *In re Maya R.*, 2018 WL 1629930, at *7; *In re M.E.N.J.*, No. E2017-01074-COA-R3-PT, 2017 WL 6603658, at *7 (Tenn. Ct. App. Dec. 27, 2017)). "When evaluating willingness, we look for more than mere words." *In re Jonathan M.*, 2018 WL 5310750, at *5. "Parents must have demonstrated their willingness by attempting to overcome the obstacles that prevent them from assuming custody or financial responsibility for the child." *Id.*

In the final order, the trial court first found that Father has had multiple incarcerations, provided no proof of a stable residence for the Child, and failed to ever visit her. Furthermore, the trial court found that the Child has numerous medical issues, which require her to see multiple practitioners, and which will require ongoing care for the foreseeable future. Despite these issues, the trial court found that the Child is meeting her milestones due to the care she receives in her foster home. The trial court further found that Father has never attended a medical appointment with the Child, nor has he attempted to understand the care required to meet her needs. Indeed, for many of the reasons discussed in this opinion, the record supports that Father has failed to demonstrate either an ability or a willingness to assume legal and physical custody or financial responsibility for the Child. Although Father originally informed DCS that he desired reunification with his daughter, his actions prove otherwise. As discussed at length above, Father failed to visit the Child or provide her with any financial support. Furthermore, Father has shown no interest in learning about the Child's medical issues and the medical interventions required to support her. Additionally, Father failed to comply with any requirements of the permanency plans, including proof of a stable residence, which could lead to his reunion with her. This disinterest in the Child continued through trial, where Father failed to appear, despite receiving notice of same. Clearly, Father lacked both the willingness and ability to assume custody of the Child or to be financially responsible for her. Tenn. Code Ann. § 36-1-113(g)(14). *See In re Amynn K.*, 2018 WL 3058280, at *15 ("We

recognize that Father has repeatedly verbalized his willingness to assume custody of the Child. However, Father's actions, including his continued criminal activity and his failure to financially support the Child, raise doubt as to Father's actual willingness to assume custody or financial responsibility for the Child."). For these reasons, we agree with the trial court that DCS met its burden as to the first prong in the analysis.

As discussed above, the second prong of the analysis required DCS to prove, by clear and convincing evidence, that placing the Child in Father's "legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the [C]hild." Tenn. Code Ann. § 36-1-113(g)(14). Regarding what constitutes "substantial harm," we have explained that

> [t]he courts have not undertaken to define the circumstances that pose a risk of substantial harm to a child. These circumstances are not amenable to precise definition because of the variability of human conduct. However, the use of the modifier "substantial" indicates two things. First, it connotes a real hazard or danger that is not minor, trivial, or insignificant. Second, it indicates that the harm must be more than a theoretical possibility. While the harm need not be inevitable, it must be sufficiently probable to prompt a reasonable person to believe that the harm will occur more likely than not.

*In re Maya R.*, 2018 WL 1629930, at *8 (quoting *Ray v. Ray*, 83 S.W.3d 726, 732 (Tenn. Ct. App. 2001)).

In the final order, the trial court found that placing the Child in Father's care would pose a risk of substantial harm to her physical or psychological welfare. The trial court's finding was based on the Child's numerous medical issues, which require ongoing treatment, and Father's failure to attend any medical appointments or to make any effort to learn how to care for her. The trial court's finding was also predicated on Father's failure to visit the Child and the Child's bond with her foster family. The record supports the trial court's findings. Specifically, the record shows that, aside from the gastroschisis, discussed above, for which the Child underwent surgery at her birth, the Child suffers from: (1) partial facial paralysis; (2) an umbilical hernia where she had her surgery; (3) a weakness and deficit on her left side; (4) an overall inability to emote; (5) difficulty chewing; (6) balance issues; and (7) the inability to move her eyes from side to side. Foster Mother testified that these conditions have resulted in the Child having had thirty doctors' appointments in the first eighteen months of her life. Furthermore, while the Child's prognosis is positive, Foster Mother testified that the Child will require multiple therapeutic interventions and surgeries to correct her conditions. The record shows that, at the time of trial, the Child was seeing a developmental therapist and a physical therapist once per week. Returning the Child to Father, who has proven himself incapable of providing support for any child would most certainly pose a risk of substantial harm to this Child, who requires consistent medical interventions. Notwithstanding the foregoing, "[w]e have

- 15 -

previously held that returning [a] child to a virtual stranger meets the substantial harm threshold." ***In re Aniyah W.***, No. W2021-01369-COA-R3-PT, 2023 WL 2294084, at \*10 (Tenn. Ct. App. Mar. 1, 2023) (citing ***In re Brianna B.***, No. M2019-01757-COA-R3-PT, 2021 WL 306467, at \*6 (Tenn. Ct. App. Jan. 29, 2021); ***In re Braelyn S.***, No. E2020-00043-COA-R3-PT, 2020 WL 4200088, at \*17 (Tenn. Ct. App. July 22, 2020)). Indeed, the record shows that the Child is bonded with her foster family and shares no relationship with Father. To remove her from the only secure and stable environment she has ever known would inevitably cause her substantial harm. For these reasons, we agree with the trial court that DCS met its burden as to the second prong in the analysis. Accordingly, we affirm the trial court's conclusion that Father's parental rights should be terminated for failure to manifest an ability and willingness to assume custody of the Child. We now turn to the best interest analysis.

### C. Best Interest

When at least one ground for termination of parental rights has been established, the petitioner must then prove, by clear and convincing evidence, that termination of the parent's rights is in the child's best interest. ***In re Bernard T.***, 319 S.W.3d at 606 (citing ***In re Adoption of A.M.H.***, 215 S.W.3d at 809). As the Tennessee Supreme Court explained:

> Facts considered in the best interest analysis must be proven by "a preponderance of the evidence, not by clear and convincing evidence." ***In re Kaliyah S.***, [455 S.W.3d 533, 555 (Tenn. 2015)] (citing ***In re Audrey S.***, [182 S.W.3d at 861]). "After making the underlying factual findings, the trial court should then consider the combined weight of those facts to determine whether they amount to clear and convincing evidence that termination is in the child's best interest." ***Id.*** When considering these statutory factors, courts must remember that "[t]he child's best interests [are] viewed from the child's, rather than the parent's, perspective." ***In re Audrey S.***, 182 S.W.3d at 878. Indeed, "[a] focus on the perspective of the child is the common theme" evident in all of the statutory factors. ***Id.*** "[W]hen the best interests of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interests of the child. . . ." Tenn. Code Ann. § 36-1-101(d)(2017).

***In re Gabriella D.***, 531 S.W.3d 662, 681-82 (Tenn. 2017).

The Tennessee Legislature has directed that, when determining whether termination of parental rights is in a child's best interest, the court "shall consider all relevant and child-centered factors applicable to the particular case[.]" Tenn. Code Ann. § 36-1-113(i)(1). As is relevant to this appeal, these factors include, but are not limited to, the following:

(A) The effect a termination of parental rights will have on the child's critical need for stability and continuity of placement throughout the child's minority;

(B) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological, and medical condition;

(C) Whether the parent has demonstrated continuity and stability in meeting the child's basic material, educational, housing, and safety needs;

(D) Whether the parent and child have a secure and healthy parental attachment, and if not, whether there is a reasonable expectation that the parent can create such attachment;

(E) Whether the parent has maintained regular visitation or other contact with the child and used the visitation or other contact to cultivate a positive relationship with the child;

***

(H) Whether the child has created a healthy parental attachment with another person or persons in the absence of the parent;

(I) Whether the child has emotionally significant relationships with persons other than parents and caregivers, including biological or foster siblings, and the likely impact of various available outcomes on these relationships and the child's access to information about the child's heritage;

(J) Whether the parent has demonstrated such a lasting adjustment of circumstances, conduct, or conditions to make it safe and beneficial for the child to be in the home of the parent, including consideration of whether there is criminal activity in the home or by the parent, or the use of alcohol, controlled substances, or controlled substance analogues which may render the parent unable to consistently care for the child in a safe and stable manner;

(K) Whether the parent has taken advantage of available programs, services, or community resources to assist in making a lasting adjustment of circumstances, conduct, or conditions;

(L) Whether the department has made reasonable efforts to assist the parent in making a lasting adjustment in cases where the child is in the custody of the department;

(M) Whether the parent has demonstrated a sense of urgency in establishing paternity of the child, seeking custody of the child, or addressing the circumstance, conduct, or conditions that made an award of custody unsafe and not in the child's best interest;

\*\*\*

(O) Whether the parent has ever provided safe and stable care for the child or any other child;

(P) Whether the parent has demonstrated an understanding of the basic and specific needs required for the child to thrive;

(Q) Whether the parent has demonstrated the ability and commitment to creating and maintaining a home that meets the child's basic and specific needs and in which the child can thrive;

(R) Whether the physical environment of the parent's home is healthy and safe for the child;

(S) Whether the parent has consistently provided more than token financial support for the child; and

(T) Whether the mental or emotional fitness of the parent would be detrimental to the child or prevent the parent from consistently and effectively providing safe and stable care and supervision of the child.

Tenn. Code Ann. § 36-1-113(i)(1). The Legislature has also directed that, when considering the foregoing factors, "the prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest." Tenn. Code Ann. § 36-1-113(i)(2). This Court has noted that "this list [of factors] is not exhaustive, and the statute does not require a trial court to find the existence of each enumerated factor before it may conclude that terminating a parent's rights is in the best interest of a child." *In re M.A.R.*, 183 S.W.3d 652, 667 (Tenn. Ct. App. 2005), *perm. app. denied* (Tenn. Nov. 21, 2005). Depending on the circumstances of an individual case, the consideration of a single factor or other facts outside the enumerated, statutory factors may dictate the outcome of the best interest analysis. *In re Audrey S*., 182 S.W.3d at 877. As this Court explained:

Ascertaining a child's best interests . . . does not call for a rote examination of each of Tenn. Code Ann. § 36-1-113(i)'s . . . factors and then a determination of whether the sum of the factors tips in favor of or against the parent. The relevancy and weight to be given each factor depends on the unique facts of each case. Thus, depending upon the circumstances of a

- 18 -

particular child and a particular parent, the consideration of one factor may very well dictate the outcome of the analysis.

*White v. Moody*, 171 S.W.3d 187, 194 (Tenn. Ct. App. 1994).

Here, the trial court found that the foregoing factors were applicable and that all weighed in favor of termination. Specifically, the trial court found that terminating Father's parental rights would have a positive effect on the Child's critical need for stability and continuity of placement throughout her minority. *See* Tenn. Code Ann. Tenn. Code Ann. § 36-1-113(i)(1)(A). The trial court made this finding based on Father's failure to provide any financial support and/or demonstrate any continuity and stability in meeting the Child's basic material, education, housing, and safety needs. *See* Tenn. Code Ann. Tenn. Code Ann. § 36-1-113(i)(1)(C), (Q), (S). Indeed, the trial court found that Father has never provided a home for the Child. *See* Tenn. Code Ann. Tenn. Code Ann. § 36-1-113(i)(1)(O), (Q). Furthermore, the trial court found that there is criminal activity in Father's home, and that Father's history of alcohol and substance abuse renders him unable to consistently care for the Child and provide her with a safe and stable home. *See* Tenn. Code Ann. Tenn. Code Ann. § 36-1-113(i)(1)(J), (Q), (R). The trial court found that, to remove the Child from her current pre-adoptive caregivers and the only physical environment she has known for most of her life would likely have a negative effect on her emotional, psychological, and/or medical condition. *See* Tenn. Code Ann. Tenn. Code Ann. § 36-1-113(i)(1)(B). Indeed, the trial court found that the Child is bonded with her foster family, including her extended foster family, and is receiving the necessary care for her numerous medical issues. *See* Tenn. Code Ann. Tenn. Code Ann. § 36-1-113(i)(1)(A), (B), (H), (I). The trial court found that Father would likely be unable to provide the Child with the care she needs because he has never demonstrated an understanding of the basic and/or specific needs required for the Child to thrive, and he has shown no interest in learning about or addressing her medical issues. *See* Tenn. Code Ann. Tenn. Code Ann. § 36-1-113(i)(1)(M), (P), (Q). Given that Father has never visited the Child, the trial court found that he has no bond with her. *See* Tenn. Code Ann. Tenn. Code Ann. § 36-1-113(i)(1)(D), (E). The trial court also found that there is no reasonable expectation that Father would be able to create an attachment with the Child because he has never attempted to cultivate a positive relationship with her. *See* Tenn. Code Ann. Tenn. Code Ann. § 36-1-113(i)(1)(D), (E). Furthermore, the trial court found that Father failed to take advantage of programs, services, or community resources that would assist him in making a lasting adjustment of circumstances or conduct such that the Child could be returned to him. *See* Tenn. Code Ann. Tenn. Code Ann. § 36-1-113(i)(1)(K), (M), (Q). This is so, despite the trial court's finding that DCS made reasonable efforts to assist Father in making lasting adjustments to his conduct or circumstances. *See* Tenn. Code Ann. Tenn. Code Ann. § 36-1-113(i)(1)(L). Indeed, the trial court found that Father has refused to make any changes necessary for the Child to return to his care. Lastly, the trial court found that Father's mental or emotional fitness, or lack thereof, would be detrimental to the Child and would prevent Father from consistently and effectively providing safe and stable care for her.

Tenn. Code Ann. § 36-1-113(i)(1)(T).

As discussed at length above, the record supports these findings. First, Ms. Jones testified that Father never visited the Child. Accordingly, the record shows that he has no bond with her. The record also supports the trial court's finding that there is no reasonable expectation that Father would be able to create an attachment with the Child. As demonstrated by Ms. Jones' testimony, Father has failed to take any steps that would lead to visitation and/or reunification with the Child. He never submitted to a drug test, he never submitted to an alcohol or mental health assessment, he never allowed DCS into his home to determine if it was suitable for the Child, and he never provided proof of a stable income. Indeed, Father has made no lasting changes, nor has he even demonstrated a desire to do so, to allow for his reunification with the Child. Ms. Jones further testified that Father failed to provide the Child with any financial support and has shown a total lack of interest in her medical issues and/or treatments. Indeed, the record supports the trial court's finding that Father is incapable of providing the Child with the care, stability, and support she requires. As shown through the testimony of Foster Mother, the Child is currently in a stable, loving, and pre-adoptive home, and she is bonded with her foster family. Foster Mother testified as to the numerous medical issues the Child faces and the medical and therapeutic interventions that will be required to help the Child thrive. Foster Mother's testimony showed that she and her husband are dedicated to helping the Child navigate these therapies and procedures, and that the Child has the love and support of her extended foster family, with whom she is also bonded. Accordingly, we agree with the trial court that removing the Child from the only stability and support she has ever known and placing her with Father, a person whom she does not know and who does not have the ability to care for her, would certainly be detrimental to her health and wellbeing. For the many reasons discussed above, we agree with the trial court that terminating Father's parental rights is in the Child's best interest.

### V. Conclusion

For the foregoing reasons, we affirm the trial court's termination of Father's parental rights. The case is remanded for such further proceedings as may be necessary and are consistent with this opinion. Costs of the appeal are assessed against the Appellant, Michael S. Execution for costs may issue if necessary.

_s/ Kenny Armstrong_
KENNY ARMSTRONG, JUDGE